IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHAZ ALTMAN and GINA GAFFKE<br><br>Plaintiffs,<br><br>v.<br><br>P.O. KIRK HELGESEN, individually, and The VILLAGE OF GURNEE<br><br>Defendant. | No. 10 CV 05619<br><br>Judge Manish S. Shah |

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants, KIRK HELGESEN and the VILLAGE OF GURNEE, by their counsel, ELLEN K. EMERY and LUCY B. BEDNAREK of ANCEL, GLINK, DIAMOND, BUSH, DiCIANNI & KRAFTHEFER, P.C., move this Court pursuant to Federal Rule of Civil Procedure 50(a) for Judgment as a Matter of Law. In support of this motion, Defendants state as follows:

## I. INTRODUCTION

Federal Rule of Civil Procedure 50(a) provides that "if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may grant a motion for judgment as a matter of law against the party." When ruling on a motion for judgment as a matter of law, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Lobby*, 477 U.S. 242, 252 (1986).

Plaintiff Chaz Altman brought this Section 1983 excessive force action against the Village of Gurnee and Gurnee Police Officer Kirk Helgesen for injuries arising from a police

1

shooting of Altman that took place on August 22, 2010 after Gurnee police officers responded to a 911 call to the couple's home.

Defendants are entitled to judgment as a matter of law on Altman's excessive force claim because plaintiffs presented no evidence to establish that Officer Helgesen's use of force was not justified under the circumstances.

## II. OFFICER HELGESEN'S USE OF FORCE WAS JUSTIFIED

To establish his case under Section 1983, plaintiff bears the burden of proving by a preponderance of the evidence that Officer Helgesen's use of force was unreasonable under the circumstances. As a matter of law, Officer Helgesen's use of force was justified here.

The evidence shows the following: On the evening of August 22, 2010, Chaz Altman and his wife, Gina Gaffke, were at home at 3435 Pacific Avenue, in Gurnee, Illinois. They started arguing because Gaffke found drug paraphernalia in Altman's belongings, and she told him to pack up and leave the house. Altman took a twelve inch butcher knife from the knife block in the kitchen and went outside, where he called 911 and then hung up.

Gaffke's friend, Cheryl Palmer, also called 911. She told the dispatcher that Altman was drinking, had used cocaine, was walking around with a knife in his hand, and described Altman's appearance. Altman then took the phone from Palmer and told the 911 dispatcher that when the police "pull up they ain't got no choice but to shoot me," and that the dispatcher would "read about it."

The dispatcher relayed this information to the Gurnee police officers and the officers responded to the location. Officers Helgesen, Bertaud, Pugliese, Munji and Caldwell parked their cars near the scene and headed to the location on foot. Other officers also arrived on foot and positioned themselves around the perimeter of the house.

2

Officer Bertaud carried the less lethal shotgun. Officer Pugliese was the designated lethal cover officer for Officer Bertaud and carried the AR-15 rifle, also called a long gun.

When the officers turned the corner from Bay Place onto Pacific, they saw Altman standing in the middle of the street near the driveway to his house. Altman held a knife in one hand and two glass bottles in the other. Officer Bertaud identified himself and the other officers as police officers, and both Officers Bertaud and Pugliese directed Altman to drop the knife. Altman did not drop the knife. Rather, he turned around and walked back towards his house and stood behind a tree in the yard.

Officers Munji, Helgesen and Caldwell positioned themselves in the driveway at the Altman house, with Munji being closest to the garage, Helgesen in the middle and Caldwell closest to the street. The two women, Gaffke and Palmer, were directed to stand behind the Officers near the end of the driveway, which they did. Officers Bertaud and Pugliese moved closer to Altman where he was still standing behind the tree and still holding the knife. The Officers did not have trouble seeing Altman because there were street lamps on Pacific near the house and several of the Officers were illuminating the yard with flashlights.

While at the tree, Altman began shouting, "Watch this, Watch this," in the direction of Gaffke, and held the knife to his neck. Altman again was directed to drop the knife, which he did not do. As a result, Officer Bertaud shot Altman several times in the legs with less lethal rounds, attempting to make Altman drop the knife and drop to the ground. The officers are trained that a suicidal subject, like Altman appeared to be, can be homicidal – if an individual is willing to take his own life, he could possibly take someone else's life.

Altman did not drop the knife or drop to the ground. Rather, he threw one of the bottles he was holding at Bertaud and Pugliese. Officer Helgesen then heard Altman say, "Is that all you got? Let's do this for real."

Altman then moved away from the tree and began walking purposefully towards the driveway where the Officers and the two women were still standing. Officer Pugliese testified she would have shot Altman because he was still holding the knife and a threat to anyone in the driveway but could not do so due to the danger of cross fire. Officer Munji testified Altman began walking directly at Officer Helgesen, forcing Helgesen to walk backwards until he could go no further due to garbage cans and a fence behind him. Officer Munji testified he too would have shot Altman if not for the danger of cross fire because Altman "was a direct threat to Officer Helgesen, the fact that he had a knife in his hand and that he was approaching aggressively . . . and that if he would have gotten any closer to Officer Helgesen [his next direct action] was to harm [Helgsen] with that knife."

Officer Bertaud testified that Altman was only a threat to himself. However, Bertaud clarified he observed Altman only a threat to himself because Bertaud had tunnel vision and was focused only on Altman and not the other Officers or women at the scene.

Officer Helgesen testified that when Sergeant Farrow directed him to go "hands on" when the situation presented itself, he moved from behind the car, pocketed his flashlight, held his handgun with two hands, and moved closer to Altman and near the edge of the driveway. "Hands on" meant that Helgesen would be one of the arresting officers if the situation presented itself, which it never did.

At that point, Altman began walking directly towards him. Helgesen commanded Altman to drop the knife, which Altman did not do. Rather, Altman made eye contact with Helgesen and

4

continued to walk towards him. Helgesen backed up into the driveway until he was against the fence and could go no further. Altman was 3 to 5 yards from Helgesen when Helgesen shot him three times in quick succession. Altman was close to the edge of the driveway when Helgesen shot him the first time in the chest. Altman continued to advance towards Helgesen until Helgesen shot him the second and third time, at which point Altman fell. Helgesen shot Altman because he believed Altman was a threat to Helgsen and to the women.

As a police officer, Officer Helgesen was trained in surviving edged weapons. Helgesen was trained that an offender with a knife is a threat if he is closer than 30 feet. An offender closer than 30 feet from a police officer can throw the knife or run towards the officer with the knife, without the officer having enough reaction time to protect himself. When Helgesen shot Altman, Altman was closer than 30 feet from Helgesen.

Altman admitted he used cocaine and drank 6-8 shots of rum or tequila that night. He also acknowledged that he was telling his wife to "watch this," because he wanted to divert her attention away from being kicked out of the house. He further admitted that he "figured" the persons with the flashlights yelling commands at him were police officers. Altman acknowledged that his plan "was not well thought through." He claims that he was not really suicidal, and that when he was walking towards the driveway he was saying, "It's over, I'm done, it's over." No other witness heard him say this, including his wife. He also claims he did not drop the knife because he just "wasn't thinking about the knife."

A police officer's use of deadly force is a seizure subject to the reasonableness requirements of the Fourth Amendment. *Tennessee v. Garner*, 47 U.S. 1(1985). Deadly force is justified if the officer reasonably believes it is necessary to protect himself or another from death or great bodily harm. *Id.*; *Pena v. Leombruni*, 200 F.3d 1031 (7th Cir. 1999). Here, Helgesen's

5

use of deadly force here was reasonable and justified under the Fourth Amendment. The court's inquiry focuses on "whether the officer's decision to use deadly force was *objectively* reasonable." *Maravilla v. United States*, 60 F.3d 1230, 1233 (7th Cir. 1995)(emphasis in original). Whether Helgesen acted reasonably in shooting Altman must be determined "in light of the facts and circumstances confronting [him] at the moment [he] acted." *Maravilla*, at 1233, (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). In addition, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, at 396.

Altman's refusal to put the knife down, his repeatedly saying "watch this," his advancing on his wife and Palmer, and his advance on Helgesen and the other officers in the driveway was sufficiently lethal and imminent to justify Helgesen's use of deadly force. The circumstances surrounding the advancement of Altman placed him and others in imminent danger of serious bodily injury or worse.

Judge Gettleman denied defendants' motion for summary judgment for two reasons only. The first was that Altman claims he was surrendering immediately before he was shot. The second was that Officer Bertaud testified that Altman was only a threat to himself. [117]. As a result, Judge Gettleman found that if the jury believed this testimony, it could "reasonably conclude that Helgesen's decision to shoot to protect himself and/or Gaffke and Palmer was objectively unreasonable."

At the trial in this case, the evidence showed that no one, including Altman's wife, heard Altman say that he was surrendering. If Altman was in the process of surrendering, he would have put the knife down or done something of a surrendering nature. Instead, he continued to hold the knife and advance on Helgesen.

6

In addition, Officer Bertaud explained that he believed Altman was only a threat to himself because he was focusing only on Altman. Bertaud clarified he observed Altman only a threat to himself because Bertaud had tunnel vision and was focused only on Altman and not the other officers or women at the scene. Bertaud further clarified that Altman "had the potential to be a danger to someone else if he came close enough to someone with the knife." Helgesen did not have to wait and see Altman harm someone with the knife before shooting him.

In *DeLuna v. City of Rockford*, 447 F.3d 1008 (7th Cir. 2006), the defendant police officer responded to a domestic disturbance call at the home where the decedent lived with his wife and child. The officer had been called to the home before and knew the decedent could be violent. When the officer arrived, he saw the decedent standing shirtless outside the home. The officer called to the decedent, who then began walking toward the officer, making menacing statement like, "I've got something for you, you are going to have to kill me," and "shoot me here," pointing to his chest. The officer began backing away from the decedent, warning him to stop, but the decedent kept coming. The officer, walking backward, stumbled on a hole in the driveway, then fired at the decedent when it appeared to the officer that the decedent was reaching for the officer's gun.

The *DeLuna* court found that the shooting was justified, in that the officer had knowledge of the decedent's violent possibilities, he warned that he had "something" for the officer, he disregarded all instructions to stop, the officer's vulnerability increased when he stumbled, and the officer feared that the decedent had a weapon in his waistband or was reaching for the officer's gun. These factors together created a reasonable belief by the officer of imminent danger sufficient to justify his use of deadly force. *Id.*

Similarly, in several other cases, the courts have found that if a suspect threatens an officer with a weapon, the use of deadly force is reasonable, even if a suspects makes no lunging or stabbing motions. *See Roos v. Patterson*, 2013 WL 3899966 (C.D.Ill. 2013); *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988); *Howard v. City of Freeport*, 2010 WL 5175083 (N.D.Ill. 2010); *Estate of Morgan v. Cook*, 686 F.3d 494 (8th Cir. 2012); *Estate of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2008).

All of the elements present in *DeLuna* existed here, with the additional fact that Helgesen was not facing an unarmed man, he was being advanced upon by a man brazenly brandishing a butcher knife. As in *DeLuna*, Helgesen knew of Altman's violent nature (the dispatcher reported that the caller said the officers would have to shoot him), Altman looked and acted irrationally, he said "watch this," and he refused to put the knife down despite many commands to do so. In addition, his advance on Helgesen put the officer in a vulnerable position because Helgesen was backing up into a fence and garbage cans.

Further, the court in *DeLuna* observed that "Peraza [the defendant officer] need not wait until there is a physical struggle for control of his weapon before a situation presents an imminent danger of serious injury." 447 F.3d at 1013. *DeLuna* involved an unarmed man advancing on the defendant officer, where the use of deadly force was justified. Here, Altman was armed with a butcher knife. When Helgesen shot Altman, Altman was close enough to throw the knife or lunge at him. Again, Helgesen was not required to wait until either of those things happened before using deadly force to stop the knife-wielding Altman.

If ever there was a "split-second judgment – in circumstances that are tense, uncertain, and rapidly evolving," it was here. The facts are undisputed that Altman was armed with a butcher knife, refused to put it down, and continued to advance on Helgesen. Helgesen's use of

force was objectively reasonable in light of the facts and circumstances surrounding him when he acted. Therefore, this Court should grant judgment as a matter of law in favor of defendants.

Respectfully submitted,

By: /s/ Lucy B. Bednarek

Ellen K. Emery
eemery@ancelglink.com
Lucy B. Bednarek
lbednarek@ancelglink.com
ANCEL, GLINK, DIAMOND, BUSH, DICIANNI & KRAFTHEFER, P.C.
140 South Dearborn Street, Sixth Floor
Chicago, Illinois 60603
(312) 782-7606
(312) 782-0943 Fax

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys of record herein, hereby certifies that on **July 29, 2014**, the foregoing **DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW** was electronically filed with the Clerk of the U.S. District Court using the CM/ECF System, which will send notification of such filing to the following:

Gregory E. Kulis
Josh Patrick
Gregory E. Kulis & Associates
30 North LaSalle Street – Suite 2140
Chicago, IL 60602
gkulis@kulislawltd.com
jpatrick@kulislawltd.com


/s/ Lucy B. Bednarek
One of the attorneys for Defendants


ANCEL, GLINK, DIAMOND, BUSH, DICIANNI
& KRAFTHEFER, P.C.
140 South Dearborn Street, Sixth Floor
Chicago, Illinois 60603
Telephone: (312) 782-7606
Facsimile: (312) 782-0943
E-Mail: lbednarek@ancelglink.com

4844-7288-7324, v. 2